**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1470-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

BRIONNE CUFF,

     Defendant-Appellant.

_____

> Submitted March 21, 2021 – Decided April 1, 2022
>
> Before Judges Fasciale and Sumners.
>
> On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 17-12-1070.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (John Vincent Saykanic, Designated Counsel, on the brief).
>
> Jennifer Webb-McRae, Cumberland County Prosecutor, attorney for respondent (Kaila L. Diodati, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant appeals from his convictions for third-degree possession of a controlled dangerous substance (CDS) (cocaine), N.J.S.A. 2C:35-10(a)(1); third-degree possession of CDS (heroin), N.J.S.A. 2C:35-10(a)(1); third-degree possession of CDS with intent to distribute (cocaine), N.J.S.A. 2C:35-5(a)(2); and third-degree possession of CDS with intent to distribute (heroin), N.J.S.A. 2C:35-5(a)(2). After appropriate mergers, defendant received an aggregate four-year prison sentence, which he has served. We affirm.

In March 2017, State Trooper Dennis Ehret was on "a plainclothes detail in an undercover vehicle" tasked with "trying to deter any violent crime or illegal narcotic activity." Troopers Michael Falciani and Carl Kite accompanied Ehret. The troopers "observed a blue Honda minivan, which was operated by [defendant], travel[] and then turn[] into [a] Gulf Gas Station." Ehret testified that he saw a white male, later identified as co-defendant Joseph Berry, exit a silver Nissan parked nearby and walk over to the driver's side of the blue minivan.[1] Berry and defendant then "[e]ngaged in a brief conversation, some currency was exchanged from [Berry] standing outside the vehicle and in return,

---

[1] Berry pled guilty to conspiracy to agree/engage in conduct that constitutes a crime to possess a CDS, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:35-10(a)(1).

he got some small items and returned to his vehicle on the driver's side." Berry testified that he purchased a "bag of crack" and a "bag of heroin" from defendant, who he knew only as "Jay," at the gas station. Ehret testified that the exchange occurred "a short distance away from [his] location" and that he was able to see that Berry had "small items in his hand when he walked back."

The troopers then exited the undercover vehicle. Falciani went over to the silver Nissan while Kite and Ehret approached the blue minivan. Falciani began speaking with Berry and "observed what [he] believed [to be] CDS, narcotics on his lap." Falciani relayed his discovery to Kite and Ehret, and then he placed Berry under arrest. He also removed Berry's girlfriend from the passenger seat of the Nissan, but "[s]he was subsequently let go." Mandell Hunter, a State Police forensic scientist and the State's expert witness, testified that she tested the suspected narcotics found in Berry's lap and opined that they contained cocaine and heroin.

When Falciani informed Kite and Ehret of his discovery, Kite asked defendant to exit the blue minivan and arrested him. Ehret opened the passenger side door, found Kevin Myers sitting in the rear, removed him from the vehicle, and detained him. Kite read defendant his Miranda[2] rights and searched him

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

incident to the arrest. Kite "located [twenty] individually wrapped wax folds in [defendant's] left jacket" pocket. In defendant's right jacket pocket, Kite found "$2,615 in U.S. currency, small denominations." He also found "multiple . . . plastic vials of . . . suspected crack cocaine and also numerous additional wax folds of heroin" in defendant's right sock. Hunter testified that she tested one of the forty-four total wax folds found on defendant's person and one of the plastic vials and opined that they contained heroin and cocaine, respectively.

Detective Christopher Rodriguez testified as an expert for the State on drug distribution. He testified that heroin is typically packaged for sale in "individual little wax fold bags," and that "for an individual user to possess . . . more than . . . [ten], [twenty] bags of heroin is . . . kind of unheard of." Rodriguez also testified that it would be common for a "street level [drug] dealer to have a large amount of currency" on their person, but that "to find a user with any type of substantial money, that is very, very rare."

After obtaining consent to search the minivan from defendant, Ehret found a cigarette package "on the floor, just to the left of where . . . Myers was seated," that contained "a glass smoking pipe" and "suspected crack cocaine." Ehret testified that he asked Myers "if the cigarette package was his" and Myers responded, "that the cigarettes were his and requested the cigarettes." Myers,

4

however, testified that he was undergoing chemotherapy treatment for lung cancer at the time, that he did not smoke, and that the cigarette package was not his.

On appeal, defendant argues:

POINT I

THE TRIAL TESTIMONY OF THE STATE'S WITNESS TROOPER EHRET AS TO AN "INTERVIEW" WITH DEFENDANT . . . VIOLATED HIS FIFTH AMENDMENT PRIVILEGE AGAINST SELF-INCRIMINATION, NEW JERSEY COMMON LAW, COURT RULES AND PRIVILEGE AGAINST SELF-INCRIMINATION, WARRANTING A REVERSAL OF DEFENDANT'S CONVICTIONS; THIS IS THE FIRST INSTANCE IN A PATTERN OF PROSECUTORIAL MISCONDUCT.

POINT II

THE TRIAL TESTIMONY OF THE STATE'S WITNESS TROOPER EHRET AS TO THE PRIOR BAD ACT OF DEFENDANT (THAT HE "WAS DEALING NARCOTICS"[—]THE VERY CHARGE FOR WHICH HE WAS BEING TRIED) CONTINUED THE PATTERN OF PROSECUTORIAL MISCONDUCT AND DEPRIVED DEFENDANT OF HIS FOURTEENTH AMENDMENT DUE PROCESS AND NEW JERSEY STATE CONSTITUTIONAL RIGHT TO A FAIR TRIAL, WARRANTING REVERSAL OF CONVICTIONS.

A-1470-19

POINT III

THE TRIAL TESTIMONY OF THE STATE'S WITNESS TROOPER KITE THAT THE WAX FOLDS FOUND ON DEFENDANT WERE "COMMONLY USED FOR DISTRIBUTION" AND THE CASH THAT HE POSSESSED WAS "ALSO CONSISTENT WITH DISTRIBUTION OF DRUGS" (I.E., DEFENDANT "WAS DEALING NARCOTICS") CONTINUED THE PATTERN OF PROSECUTORIAL MISCONDUCT AND DEPRIVED DEFENDANT OF HIS FOURTEENTH AMENDMENT DUE PROCESS AND STATE CONSTITUTIONAL RIGHT TO A FAIR TRIAL, WARRANTING REVERSAL.

POINT IV

THE TRIAL TESTIMONY OF THE STATE'S WITNESS TROOPER KITE AS TO THE PRIOR BAD ACT OF DEFENDANT (THAT DEFENDANT "WAS SELLING DRUGS FROM A BLUE MINIVAN"[—]THE VERY CHARGE FOR WHICH HE WAS BEING TRIED) CONTINUED THE PATTERN OF PROSECUTORIAL MISCONDUCT AND DEPRIVED DEFENDANT OF HIS FOURTEENTH AMENDMENT DUE PROCESS AND STATE CONSTITUTIONAL RIGHT TO A FAIR TRIAL, WARRANTING REVERSAL OF CONVICTIONS.

POINT V

THE TRIAL TESTIMONY OF THE STATE'S WITNESS JOSEPH BERRY AS TO THE PRIOR BAD ACT OF DEFENDANT (THAT DEFENDANT HAD PREVIOUSLY SOLD HIM DRUGS[—]THE VERY CHARGE FOR WHICH HE WAS BEING TRIED) DEPRIVED DEFENDANT OF HIS FOURTEENTH

AMENDMENT DUE PROCESS AND STATE CONSTITUTIONAL RIGHT TO A FAIR TRIAL, WARRANTING REVERSAL OF CONVICTIONS.

POINT VI

THE PATTERN OF PROSECUTORIAL MISCONDUCT (AND INADEQUACY OF THE LIMITING INSTRUCTIONS) DEPRIVED DEFENDANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL.

POINT VII

ALL EVIDENCE SEIZED FROM DEFENDANT AND HIS VEHICLE SHOULD BE SUPPRESSED SINCE: A) THERE WAS AN ABSENCE OF A REASONABLE OR ARTICULABLE SUSPICION OF A TRAFFIC OR SAFETY VIOLATION OR SUSPICION TO BELIEVE THAT A CRIME WAS BEING COMMITTED, AND THE STOP/SEIZURE OF DEFENDANT'S VEHICLE WAS PRETEXTUAL AND BASED UPON "LUCK AND HUNCH"; AND B) THE POLICE LACKED A REASONABLE BASIS TO REQUEST CONSENT TO SEARCH DEFENDANT'S VEHICLE.

[A.] The Stop/Seizure Of Defendant Was Pretextual.

[B.] The Police Lacked A Reasonable Basis To Request Consent To Search.

POINT VIII

THE TRIAL [JUDGE] ABUSED [HIS] DISCRETION IN DENYING THE SEVERANCE MOTION.

A-1470-19

POINT IX

THE TRIAL [JUDGE] ERRED IN DENYING THE MOTION FOR JUDGMENT OF ACQUITTAL, AS THE STATE DID NOT PROVE DEFENDANT'S GUILT BEYOND A REASONABLE DOUBT; . . . DEFENDANT'S CONVICTION IS CONTRARY TO THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND NEW JERSEY STATE CONSTITUTION (1947) ART. I, PAR[S]. 1, 10.

POINT X

THE CONVICTIONS SHOULD BE REVERSED AS THE STATE DID NOT PRESENT AN UNINTERRUPTED CHAIN OF CUSTODY AND THE TRIAL [JUDGE] IMPERMISSIBLY FAVORED THE STATE BY ADVISING THE PROSECUT[ION] HOW TO SHORE UP ITS EVIDENTIARY CHAIN OF CUSTODY.

POINT XI

THE [JUDGE] ERRED IN DENYING THE MOTION FOR A NEW TRIAL UNDER R[ULE] 3:20-1.

[A.] The Suppression Issue[.]

[B.] The Trial [Judge] Improperly Permitted The State To Present A Witness, Detective Wehling, Who Was Not On The Witness List[.]

[C.] Trooper Ehret's Testimony About Defendant's Statement, Despite Warnings Not To Mention It[.]

[D.] Trooper Kite Improperly Testified As An Expert[.]

[E.] The Trial [Judge] Erred In Denying The New Trial Motion Based Upon The Post-Trial Legal Action Involving The State's Witness Joseph Berry[.][3]

POINT XII

THE PATTERN OF PROSECUTORIAL MISCONDUCT EXTENDED TO THE DISCOVERY VIOLATIONS WHICH DEPRIVED DEFENDANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL; SPECIFICALLY, THE USE OF THE SURPRISE WITNESS LYNN WEHLING TO SHORE UP THE STATE'S CHAIN OF CUSTODY AND THE FAILURE BY THE STATE TO REVEAL AN EXTREMELY FAVORABLE SENTENCING OF THE STATE'S WITNESS JOSEPH BERRY.

POINT XIII

THE NUMEROUS LEGAL ERRORS COMMITTED BY THE [JUDGE] DEPRIVED DEFENDANT OF HIS FIFTH, SIXTH AND FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL AND NEW JERSEY CONSTITUTIONAL RIGHT TO A FAIR TRIAL; U.S. CONST. AMENDS. VI AND XIV; N.J. CONST. (1947) ART. 1, PAR. 10.

---

[3] To comport with our style conventions, defendants' Point VII.A and B and Point XI.A through E have been altered but the alterations have been omitted for readability.

A-1470-19

## I.

Defendant argues that his Fifth Amendment privilege against self-incrimination was violated when Ehret testified on direct examination that he "interviewed [defendant]."

Defendant initially sought to suppress the statement he made to police as "fruit of the poisonous tree" of "the stop," which defendant argued was unconstitutional. At a status conference in July 2019, the parties indicated they were negotiating whether an edited version of the statement should be admitted into evidence. The State decided not to use the statement and did not introduce it into evidence at trial.

On direct examination, the assistant prosecutor asked Ehret if he did "anything else in relation to the case" on the day of defendant's arrest, and Ehret testified that he "interviewed" defendant. Defense counsel objected. The prosecutor stated that she instructed Ehret not to mention the interview and that she was "trying to get to the fact that he collected the evidence and did the currency seizure form." The trial judge sustained the objection, struck the remark, and instructed the jury to disregard it. Defendant moved for a mistrial, which the judge denied.

A-1470-19

An error that was brought to the trial judge's attention, like here, will not be ground for reversal if it was "harmless error." Willner v. Vertical Reality, Inc., 235 N.J. 65, 79 (2018). That is, "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. An error is clearly capable of producing an unjust result if it is "sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached." State v. Daniels, 182 N.J. 80, 95 (2004) (alteration in original) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). "Therefore, [an] 'error must be evaluated in light of the overall strength of the State's case.'" State v. Trinidad, 241 N.J. 425, 451 (2020) (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)). This is true even if the error is of constitutional dimension. Macon, 57 N.J. at 338.

The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "[T]his privilege against self-incrimination [is] applicable to the states, through the [F]ourteenth [A]mendment." State v. Hartley, 103 N.J. 252, 260 (1986). "Although we have no similar provision in our New Jersey Constitution, the privilege itself 'is firmly established as part of

the common law of New Jersey and has been incorporated into our Rules of Evidence.'" Ibid. (quoting In re Martin, 90 N.J. 295, 331 (1982)).

Here, Ehret's testimony did not violate defendant's right to remain silent. Defendant's statement itself was not admitted into evidence. The trial judge also issued a strong curative instruction, which defendant has not challenged on appeal. We presume that juries follow instructions. See State v. Herbert, 457 N.J. Super. 490, 503 (App. Div. 2019). Finally, even if the testimony was error, it was harmless. The testimony did not suggest that defendant had incriminated himself. Defendant himself offers no theory of how Ehret's comment was prejudicial.

## II.

Defendant argues that the trial judge abused his discretion in determining the State adequately established a chain of custody for the evidence seized from the scene. He also contends that the judge "impermissibly favored the State by advising the prosecut[ion] how to shore up its evidentiary chain of custody."

"Whether the requisite chain of possession has been sufficiently established to justify admission of the exhibit is a matter committed to the discretion of the trial judge, and his determination will not be overturned in the

12

absence of a clearly mistaken exercise thereof." State v. Brown, 99 N.J. Super. 22, 27 (App. Div. 1968).

On direct, Ehret was asked, "is that evidence that you delivered anywhere," referring to evidence taken from the scene. Ehret responded, "I didn't personally deliver it." Defense counsel asked on cross-examination:

> Q. And I believe you testified on direct examination that you didn't personally deliver the items to the Cumberland County Prosecutor's Office[] Evidence Unit; correct?
>
> A. I don't recall that, sir.
>
> Q. I believe you testified on direct examination just a few minutes ago that you didn't personally deliver it; is that fair?
>
> A. Oh. Fair, sir.

He also testified that an "Evidence Submission Review" document he prepared for the Cumberland County Prosecutor's Office, "stating that I'm submitting the evidence," did not identify the State Police member or law enforcement agent who delivered the items to the county. Ehret did, however, testify that he brought the evidence from the scene to the Bridgeton State Police station and "packaged [it] there."

When the State sought to introduce the wax folds alleged to contain heroin, defense counsel objected that the State had failed to establish an

uninterrupted chain of custody because it did not "identify who from the State Police brought all these items to the Cumberland County Prosecutor's Office." The judge stated that "defects in the chain of custody only go to the weight of the evidence, not to its admissibility, generally," but he ruled that the evidence could not be admitted until expert testimony established that it contained heroin.

Ronald Clouser, a detective in the Cumberland County Prosecutor's Office Evidence Unit, testified that he delivered the evidence from the Evidence Unit to a lab for testing on February 13, 2019, and back to the Evidence Unit after testing on March 19, 2019. The judge admitted evidence receipts documenting his deliveries into evidence. On cross-examination, Clouser was asked, "you don't know who or how the evidence was originally delivered to the Prosecutor's Office by the State Police; correct?" Clouser responded, "I'm sure I was there but as for who did it or when, I have to rely on documents."

After Clouser's testimony, the judge brought counsel to sidebar to discuss the chain of custody issue. Over defense counsel's objection, the judge told the prosecutor to look into a logbook for when the evidence was received.

The following day, the prosecutor sought to introduce an evidence locker log that had not been provided to the defense in discovery and to have Detective Wehling testify as to the role she played in the chain of custody. The log

14

contained an entry with Ehret's initials and "badge number" dated March 20, 2017, apparently indicating that Ehret "deliver[ed] the items to the Prosecutor's Office." Wehling was not on the State's original witness list but was named on a "property inventory report" dated March 21, 2017, which had been produced in discovery. Defense counsel objected and moved to bar Wehling's testimony and the log from evidence.

The judge ruled the evidence locker log inadmissible, reasoning that "the [d]efense predicated a large portion of its strategy upon the failure of production" of evidence concerning the chain of custody and that "it would be fundamentally unfair to the [d]efense to allow the Prosecution in the [eleventh] hour to plug the hole [in the chain of custody] with a document that, quite frankly, everybody should have known existed." However, the judge considered the logbook in determining that the evidence seized at the scene was admissible. He also permitted the admission of the property inventory report and allowed Wehling to testify. The judge reiterated that defects in the chain of custody go "to the weight of the evidence" and explained that his rulings would preserve defendant's argument that the State had failed to establish the narcotics in evidence were seized from defendant.

A-1470-19

Wehling testified that she transported the evidence from a "secured temporary locker at the Organized Crime Bureau headquarters" "to the Evidence Unit," which are both "within the Cumberland County Prosecutor's Office's organization," but at different locations. The evidence receipt documented the transfer listed on March 21, 2017, at approximately 9:13 a.m. It also stated, "contact recovered by Bridgeton Trooper" but did not "say which trooper or who it was provided by."

N.J.R.E. 901 provides that, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must present evidence sufficient to support a finding that the item is what its proponent claims." "A party introducing tangible evidence has the burden of laying a proper foundation for its admission. That foundation should include a showing of an uninterrupted chain of possession." State v. Brunson, 132 N.J. 377, 393 (1993). That is, "where the incriminating object has passed out of the possession of the original receiver and into the possession of others, the 'chain of possession' must be established to avoid any inference that there has been substitution or tampering." Brown, 99 N.J. Super. at 27.

However, "[w]hen the custodian is a State agency, the State is not obligated to negate every possibility of substitution or change in condition of

the evidence." Brunson, 132 N.J. at 393. "Generally it is sufficient if the [judge] finds in reasonable probability that the evidence has not been changed in important respects, or is in substantially the same condition as when the crime was committed." Brown, 99 N.J. Super. at 28 (internal citations omitted). "Furthermore, a defect in the chain of custody goes to the weight, not the admissibility, of the evidence introduced." State v. Morton, 155 N.J. 383, 446-47 (1998) (quoting United States v. Matta-Ballesteros, 71 F.3d 754, 769 (9th Cir. 1995)).

The State established that troopers Ehret, Falciani, and Kite collected the evidence on the evening of March 20, 2017. Ehret testified that he then brought the evidence to the Bridgeton police station. The State established that Wehling transported the evidence from a temporary evidence locker at the Organized Crime Bureau to the Evidence Unit the next morning at 9:13 a.m. Every transfer of possession from then on was accounted for.

The only arguable gap in the chain of custody was the transfer from one law enforcement location (the Bridgeton police station) to another (the temporary evidence locker) in the brief period between the evening of March 20 and the morning of March 21. The trial judge concluded that the evidence locker log, which appeared to indicate that Ehret delivered the evidence to the locker

on March 20, "fill[ed] the gap" sufficiently to admit the evidence, but that the log itself could not be admitted to "plug the hole" and "deprive the [d]efense of [its] argument" before the jury. Based on this record, there was a sufficient basis to find a reasonable probability that the evidence had not been substituted or tampered with.

Defendant also argues that the trial judge "impermissibly acted as an advocate for the State by advising the prosecut[ion] how to shore up its evidentiary chain of custody." Defense counsel raised chain of custody issues several times during trial, including, as the trial judge noted, before the State had the opportunity to completely develop the chain of custody as to a particular item. When the prosecutor produced the evidence locker log, the judge explained that he asked whether the State "maintain[ed] a log because" he assumed the State did. The judge explained that it was unusual for such "errors in production" to be "driving the trial," rather than resolved pretrial in "the normal process of fleshing out all of the discovery." The judge's explanation demonstrates that he was acting in the interest of judicial economy, not as an advocate.

III.

Defendant argues that the trial judge erred in denying his motion to suppress all evidence seized from his person and vehicle. He contends (1) police lacked a reasonable suspicion to initiate the stop of defendant's vehicle and (2) police lacked a reasonable basis to request consent to search defendant's vehicle.

When "reviewing a motion to suppress, an appellate court 'must uphold the factual findings underlying the trial [judge]'s decision so long as those findings are supported by sufficient credible evidence in the record.'" State v. Handy, 206 N.J. 39, 44 (2011) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). Deference is given to credibility findings. State v. Hubbard, 222 N.J. 249, 264 (2015). We give deference to factual findings in recognition of the trial judge's "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). However, legal conclusions to be drawn from those facts are reviewed de novo. State v. Smith, 212 N.J. 365, 387 (2012).

A.

Defendant contends that the trial judge erred in concluding that the troopers had reasonable suspicion to stop defendant because the judge "erred in

finding Ehret credible." Defendant further asserts that Ehret "either testified falsely or created a false document to justify his investigation." Considering the cold record before us, we find this assertion unpersuasive. Ehret's explanation for the inaccuracy in his report was plausible and we defer to the trial judge's credibility findings.

To be lawful, the "stop of an automobile must be based on reasonable and articulable suspicion that an offense . . . has been or is being committed." State v. Carty, 170 N.J. 632, 639-40 (2002). The State bears the burden of showing that the stop was "based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity." State v. Alessi, 240 N.J. 501, 518 (2020) (quoting State v. Mann, 203 N.J. 328, 338 (2010)). Judges "evaluate the totality of the circumstances to determine whether an officer had a reasonable suspicion that justified an investigatory stop." Ibid. In that analysis, weight is given to "the officer's knowledge and experience," and the "rational inferences that could be drawn from the facts objectively and reasonably viewed in light of the officer's expertise." State v. Todd, 355 N.J. Super. 132, 137-38 (App. Div. 2002) (quoting State v. Arthur, 149 N.J. 1, 10-11 (1997)). If the State cannot meet its

burden, evidence obtained through the stop must be suppressed.  Mann, 203 N.J. at 339.

At the hearing on defendant's suppression motion, the judge heard testimony from Ehret on the circumstances leading to defendant's arrest.  In an "Investigation Report" written on April 13, 2017, twenty-four days after defendant's arrest, Ehret stated that when he and the other troopers first saw defendant driving the blue minivan, they "were able to identify [defendant] from interactions with him during previous narcotics investigations."  However, during the hearing, Ehret testified that he had never personally interacted with defendant.

After identifying defendant and watching him pull into a gas station, Ehret observed "a brief conversation" and an exchange of money and items between defendant and the person later identified as Berry.  Ehret testified that he "determined it to be a hand-to-hand narcotics transaction" based on his experience "from previous narcotics investigations."  Ehret had been a State Trooper for four years, and before that, had "worked on a Drug Task Force" in the Cape May County Prosecutor's Office.

Defense counsel moved to suppress the evidence.  The judge denied the suppression motion and found that Ehret testified credibly.  Moreover, "even if

21

he [had not recognized defendant,] he could follow that vehicle . . . . He doesn't require reasonable articulable suspicion to view things that are in public. He can view them. He didn't stop the vehicle; [the troopers] didn't pull the vehicle over. They were making observations." Nevertheless, the judge found that the troopers "did recognize [defendant], which heightened their suspicion."

The judge concluded that Ehret's recognition of the hand-to-hand as a drug transaction "created a sufficient basis to approach the vehicles." This quickly became probable cause to arrest all parties to the transaction when Falciani "observed CDS in plain view on [Berry's] lap."

The judge did not err in concluding that the troopers had a reasonable suspicion to stop the vehicles. The circumstances here—Ehret's recognition of the exchange between defendant and Berry as a hand-to-hand drug transaction based on his experience, combined with second-hand information that defendant was involved in selling narcotics[4]—are comparable to cases in which an officer was found to have reasonable suspicion that a defendant was engaging in a drug transaction based on observation of a hand-to-hand transaction in an area of high drug activity. See State v. Ramos, 282 N.J. Super. 19, 21-22 (App. Div. 1995).

---

[4] Hearsay can be considered when determining whether an officer had sufficient cause for a search or seizure in the Fourth Amendment context. State v. Brown, 170 N.J. 138, 157 (2000).

We therefore conclude that the State met its burden and the troopers had reasonable suspicion to justify an investigatory stop.

B.

Defendant contends that his consent was invalid because the troopers "did not make any inquiries or investigation as to the owner of the vehicle, or whether defendant was authorized to consent to search." And he further contends that his consent was coerced. But there is no evidence to suggest the troopers coerced his consent or needed to inquire as to the owner of the vehicle. We, therefore, disagree.

"[C]onsent searches . . . are afforded a higher level of scrutiny" under the New Jersey Constitution than under the Federal Constitution. Carty, 170 N.J. at 639. "[A]ny consent given by an individual to a police officer to conduct a warrantless search must be given knowingly and voluntarily." Ibid. Additionally, our Supreme Court has held that a police officer must have cause to seek consent to search a vehicle "following a lawful stop of a motor vehicle." Id. at 647. Specifically, an officer must have a "reasonable and articulable suspicion" of criminal wrongdoing, not merely of a traffic violation, to request consent to search. Ibid. "A suspicionless consent search shall be deemed

unconstitutional whether it preceded or followed completion of the lawful traffic stop." Ibid.

Defendant's arguments fail for two reasons. "Ordinarily a driver has the authority to consent to the search of the vehicle unless there is evidence that suggests he/she does not have control over the vehicle." State v. Montesano, 298 N.J. Super. 597, 611 (App. Div. 1997). There was no such evidence when defendant consented to the search. Therefore, there were no grounds for the troopers to inquire to the ownership of the vehicle. And, while defendant was "under arrest and handcuffed," the fact that a defendant was detained when he consented to a search does not alone vitiate voluntary consent. See State v. Cancel, 256 N.J. Super. 430, 434 (App. Div. 1992) (holding the "[d]efendant's consent was voluntary, i.e., it was the result of a free (albeit discomfiting) choice, even though it was given while she was detained against her will").

Even if the court erred by not suppressing evidence obtained in the search of the vehicle, this error would be harmless. Count three against defendant, pertaining to marijuana found in the minivan, was dropped. Myers, not defendant, was tried for possessing the cocaine found in the cigarette package located in the back seat of the minivan. Defendant was not tried on any charges

pertaining to drugs found in the search of the minivan, rather, he was tried for possessing the drugs found on his and Berry's persons incident to their arrests.

IV.

Defendant argues that there are three instances of witnesses testifying to his prior bad acts that deprived him of a fair trial. And while the trial judge gave curative or limiting instructions to the jury, defendant contends these instructions could not cure the prejudice arising from the improper testimony. But, as defendant recognizes, each of these instances were followed with a curative or limiting instruction. Save for the third instance, the curative instructions properly limited what the jury could consider. And as to the third instance, the error—in light of the overwhelming evidence—was harmless.

"Trial court decisions concerning the admission of other-crimes evidence should be afforded 'great deference,' and will be reversed only in light of a 'clear error of judgment.'" State v. Gillispie, 208 N.J. 59, 84 (2011) (quoting State v. Barden, 195 N.J. 375, 390-91 (2008)). Furthermore, the admission of other-crimes evidence will be harmless where there is "overwhelming proof . . . of [the] defendant['s] guilt, independent of the other-crimes evidence." Id. at 93.

Under N.J.R.E. 404(b)(1), "evidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a

25

particular occasion the person acted in conformity with such disposition."  "The underlying danger of admitting other-crime evidence is that the jury may convict the defendant because he is 'a bad person in general.'"  State v. Cofield, 127 N.J. 328, 336 (1992) (internal quotation marks omitted) (quoting State v. Gibbons, 105 N.J. 67, 77 (1987)).   Such evidence "may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute."  N.J.R.E. 404(b)(2).  However, our Supreme Court has emphasized that trial judges must give clear jury instructions that "explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere."  Gillispie, 208 N.J. at 92 (quoting Cofield, 127 N.J. at 341).

In Cofield, the Court established a four-part test governing the admission of other-crimes evidence.  127 N.J. at 338.  To be admissible:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[Ibid.]

Defendant identifies three instances where other-crimes testimony was introduced but then later limited by the judge.

A.

During cross-examination, defense counsel elicited testimony from Ehret that he had received information from other people "about [defendant] being involved in other narcotics investigations." Ehret's police report had stated that the troopers were "able to identify [defendant] from interactions with him during previous narcotics investigations." In fact, Ehret had never interacted with defendant, and had only received the aforementioned second-hand information. Ehret had no knowledge of defendant ever being arrested in connection with a prior narcotics investigation.

On redirect examination, the prosecutor asked Ehret about the "mistake" in his report. Specifically, the prosecutor asked Ehret "[w]hat sort of information did you get about [defendant] before you encountered him," and Ehret responded "[t]hat he was dealing narcotics." The trial judge interjected, called a sidebar, and stated, "there should have been an objection," explaining that he was concerned about "evidence of prior criminal activity." The judge

27

then instructed the jury that it could not "consider that testimony as evidence that anybody committed any offenses in this case" and that there was "no evidence . . . about anything prior," but that the jury could consider the testimony in relation to whether Ehret was truthful about his report. The judge also stated that the jury could not consider the testimony because it was "hearsay," explaining "[n]obody's tested that information."

The trial judge appropriately held the testimony inadmissible except for a narrow, permissible purpose and instructed the jury accordingly. Defendant alleges no error in the judge's immediate intervention and instruction to the jury. As a general matter, "[t]hat the jury will follow the instructions given is presumed." State v. Loftin, 146 N.J. 295, 390 (1996).

Furthermore, defendant's own attorney elicited similar testimony from Ehret as part of a trial strategy to attack his credibility. "[T]rial errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal.'" State v. A.R., 213 N.J. 542, 561 (2013) (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)).

B.

During Kite's cross-examination by co-defendant Myers's counsel, Myers's counsel "opened the door" to prior knowledge of criminal activity

concerning the blue minivan.  Before engaging too far, the prosecutor objected, and the judge held a sidebar to address the issue.  The judge gave a curative instruction explaining that Kite's testimony about the blue minivan was "not evidence in this case . . . that these gentlemen did anything wrong" and that, as with Ehret's testimony, the jury could only consider it to "explain[] the officers' conduct," i.e., "[w]hy were they looking at this van."

Defendant argues that the testimony was "very prejudicial," but does not specify any particular error in the judge's instruction.  Defendant argues that "due to the sheer number of limiting instructions, their effectiveness was greatly diminished."  Our Supreme Court has said that, in the context of admitting other crimes evidence, repeating the limiting instruction is the "better practice."  State v. Blakney, 189 N.J. 88, 93 (2006).  It has also "consistently stressed the importance of immediacy and specificity" in curative instructions and explained that "a single curative instruction may not be sufficient to cure the prejudice resulting from cumulative errors at trial."  State v. Vallejo, 198 N.J. 122, 135-36 (2009).  Thus, it was not only sufficient, but necessary for the trial judge to give a separate curative instruction immediately after each instance of other-crime testimony.

C.

On redirect examination of Berry, the prosecutor elicited testimony that Berry had bought drugs from defendant previously. Defendant moved for a mistrial. The trial judge denied the motion but decided to "conduct a 104 Hearing [to] re-examine whether . . . to exclude the entire statement." Considering the Cofield factors, the judge reiterated that Berry's statement "tend[ed] to prove identity" and could be considered on that basis. The judge also reasoned that Berry's statement "was not subject to court review prior to being offered to the jury" and that, under those circumstances, "it might be more effective . . . to indicate how [the jury] could consider it," rather than instructing the jury to disregard it entirely.

Defendant argues that admitting Berry's statement to prove identity "ma[de] no sense, as identity was not an issue in this case" and that "any jury would have" considered the testimony as demonstrating a propensity to commit an offense. As defendant explains in his brief, "[t]here was no question that the individual who was arrested at the scene for allegedly selling drugs to Berry on March 20, 2017, was defendant." A limiting instruction regarding other-crimes evidence must "enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere." Gillispie, 208 N.J. at 92 (quoting Cofield,

127 N.J. at 340-41). Without a clear permissible use of the evidence, the jury was too likely to consider it for the impermissible purpose of establishing defendant's propensity to commit the crime charged.

Much for the same reasons, Berry's testimony failed to satisfy the fourth prong of the Cofield test: "The probative value of the evidence must not be outweighed by its apparent prejudice." 127 N.J. at 338. "[R]elevant evidence loses some of its probative value if there is other less inflammatory evidence available to prove that point." State v. Long, 173 N.J. 138, 164 (2002). Identity was not in dispute. Accordingly, Berry's testimony should not have been admitted.

But, ultimately, the error was harmless. "[T]o warrant reversal of defendant's conviction, [the error] must 'raise a reasonable doubt' as to whether [it] affected the result reached by the jury." State v. Prall, 231 N.J. 567, 588 (2018) (quoting Macon, 57 N.J. at 336). Despite the "highly prejudicial" nature of "propensity evidence," id. at 584, the error was harmless when evaluated in light of the strength of the State's case.

The jury heard testimony that Ehret witnessed defendant engage in a hand-to-hand exchange of cash and "some small items" with Berry at a gas station. Berry testified that the transaction was him buying crack cocaine and heroin

31

from defendant. Falciani testified that immediately following the transaction, he found suspected narcotics on Berry's person, while Kite testified that he found suspected narcotics—numerous individually wrapped wax folds and multiple plastic vials—on defendant's person. An expert for the State testified that samples from each of the items seized tested positive for heroin or cocaine. Another expert testified that it was "unheard of" for an individual user, rather than a drug dealer, to have the quantity of drugs and cash found on defendant's person. The State presented overwhelming proof of possession with intent to distribute CDS. Therefore, any error in the admission of other-crimes evidence was harmless.

V.

Defendant argues that Kite improperly testified as an expert because Kite opined on defendant's guilt when he testified that the packaging of the drugs and the amount of cash found on defendant's person were consistent with the distribution of drugs. However, the judge immediately struck the testimony and instructed the jury to disregard it. Defendant does not identify any fault in this instruction.

N.J.R.E. 701 provides:

> If a witness is not testifying as an expert, the witness'
> testimony in the form of opinions or inferences may be

admitted if it: (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue.

"[U]nlike expert opinions, lay opinion testimony is limited to what was directly perceived by the witness." State v. McLean, 205 N.J. 438, 460 (2011). Lay opinion testimony must "rest[] on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing." Id. at 456-57. By contrast, expert testimony relies on a witness's "specialized knowledge" to address "a subject matter that is beyond the ken of the average juror." State v. Kelly, 97 N.J. 178, 208 (1984).

When asked on direct examination "after [defendant] was arrested, what happened next," Kite responded:

> He was searched incident to arrest, he was read his rights as to Miranda. Incidental to arrest of the search of his person, I located [twenty] individually wrapped wax folds in his left jacket, which is commonly used for distribution. They're single doses.
>
> In his right jacket pocket, located . . . $2,615 in U.S. currency, small denominations, also consistent with distribution of drugs.

The trial judge sustained an objection by defense counsel and immediately instructed the jury to disregard Kite's opinion testimony that the items seized were "consistent with distribution," explaining: "he can tell you what he found,

33

he can tell you what it looked like, tell you how many of the things there were[,] but he can't tell you what he thinks that means. That's for you to determine."

Although "[c]ourts in New Jersey have permitted police officers to testify as lay witnesses, based on their personal observations and their long experience in areas where expert testimony might otherwise be deemed necessary," State v. LaBrutto, 114 N.J. 187, 198 (1989), testimony on "the indicia of a distribution operation," including the "significance of the quantities . . . of drugs," is in the realm of "[e]xperts." State v. Cain, 224 N.J. 410, 426 (2016). It was improper for Kite to opine as he did. However, the judge immediately struck the testimony and instructed the jury to disregard it. Defendant does not identify any fault in this instruction.

Finally, defendant contends—relying on State v. Frisby, 174 N.J. 583, 588-96 (2002)—that Kite's testimony improperly opined directly on his guilt, which warrants a reversal of his conviction. But, again, the testimony was properly stricken. Thus, any error would have been harmless, as the jury heard substantially similar testimony that the quantities were consistent with drug distribution from Rodriguez, the State's expert, and because the evidence of defendant's guilt was overwhelming.

## VI.

Defendant contends the trial judge abused his discretion in denying defendant's mid-trial motion to sever and try defendant and co-defendant Myers separately. Defendant's and Myers's defenses were not incompatible, and the judge did not abuse his discretion in denying the motion to sever.

Generally, a defendant is required to make any motion to sever before trial. R. 3:15-2(c); R. 3:10-2. We review the trial judge's decision on a motion to sever under the abuse of discretion standard. State v. Weaver, 219 N.J. 131, 149 (2014).

Two or more defendants may be charged and tried jointly "if they are alleged to have participated in the same act or transaction" constituting the offenses. R. 3:7-7; R. 3:15-1. If it appears that a defendant is prejudiced by the joint trial, the trial judge may sever. R. 3:15-2(b). "One instance in which a defendant is prejudiced by a joint trial is when a defendant's and a co-defendant's defenses are not simply at odds, but are 'antagonistic at their core,' meaning that they are mutually exclusive and the jury could believe only one of them." Weaver, 219 N.J. at 149 (quoting State v. Brown, 118 N.J. 595, 605-07 (1990)).

Here, defendant contends that the trial judge abused his discretion in denying his motion to sever after Myers testified that he did not smoke and that

the cigarette package found in the backseat of the blue minivan was not his, which defense counsel argued was "fundamentally inconsistent" with his own client's defense.

First, Myers and defendant were not the only two possible owners of the cigarette package containing cocaine. The jury heard testimony that defendant was not the minivan's owner; anything in the backseat of the vehicle could have belonged to that third party. Thus, Myers's denial did not necessarily implicate defendant in possessing the cocaine found in the cigarette package. Second, Myers, not defendant, was being tried for possessing the cocaine found in the cigarette package. Defendant was charged in relation to the heroin and cocaine found on his and Berry's person. Thus, Myers's defense did not implicate defendant in the crimes for which he was actually charged. The judge did not abuse his discretion in denying the motion to sever.

## VII.

Defendant asserts that the trial judge erred in denying his motion for judgment of acquittal.

Rule 3:18-1 provides that a defendant may, at the close of evidence, move for the entry of a judgment of acquittal on the grounds that "the evidence is insufficient to warrant a conviction." When considering a Rule 3:18-1 motion,

"the trial judge must determine . . . whether, viewing the State's evidence in its entirety, . . . and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt." State v. Reyes, 50 N.J. 454, 459 (1967). This test also governs appellate review of the trial judge's ruling. See State v. Moffa, 42 N.J. 258, 263 (1964).

Here, defendant argues that "[a]s to the possession with intent to distribute cocaine charge, there is a lack of evidence as to distribution," but does not elaborate further. This argument is unpersuasive. Berry testified that he purchased crack cocaine from defendant, in addition to heroin. Generally, credibility issues should not be resolved by a judge when ruling on a motion to acquit, and these issues are properly submitted to the jury. See State v. Pickett, 241 N.J. Super. 259, 265 (App. Div. 1990).

Defendant also says, "[i]n addition, there is a chain of possession issue." However, giving the State the benefit of all reasonable inferences from the chain of possession testimony, a reasonable jury could have found that the drugs in evidence at trial were seized from defendant.

VIII.

Defendant argues that the State violated its discovery obligations by (1) "the use of the surprise witness Lynn Wehling to shore up the State's chain of custody" and (2) "the failure by the State to reveal an extremely favorable sentencing of . . . Berry," and that the trial judge erred in denying a post-verdict new trial motion on those bases. But Wehling's testimony did not unduly prejudice defendant. And there was no evidence that Berry's sentence was the product of an agreement for his testimony. Thus, the State was not obligated to disclose the sentence itself, which was imposed after the verdict in defendant's case.

A.

Defendant contends that the trial judge erred in denying his new trial motion because the judge improperly admitted Wehling's testimony at trial despite the State's failure to list her as a witness in discovery.

We review a decision regarding the appropriate remedy for a discovery violation under an abuse of discretion standard. State v. Tier, 228 N.J. 555, 561 (2017). Reversal of a conviction is warranted if the judge finds that the State's discovery violation prejudiced defendant by denying him a fair trial. See State v. Blake, 234 N.J. Super. 166, 172-75 (App. Div. 1989). "Denials of mistrial

38

motions have been overturned where 'a different trial strategy would have been employed' but for the discovery violation." State v. Harris, 181 N.J. 391, 519 (2004) (quoting Blake, 234 N.J. Super. at 175). For example, we have reversed convictions where the prosecution failed to disclose a statement made by the defendant until cross-examination, reasoning that the defendant may not have testified had the statement been disclosed. Blake, 234 N.J. Super. at 174-75.

Rule 3:13-3(b)(1)(F) requires the production of "names . . . of any persons whom the prosecutor knows to have relevant evidence or information including a designation by the prosecutor as to which of those persons may be called as witnesses." If the State fails to comply with its discovery obligations, the trial judge "may order [the State] to permit the discovery of materials not previously disclosed, grant a continuance or delay during trial, or prohibit the [State] from introducing in evidence the material not disclosed, or it may enter such other order as it deems appropriate." R. 3:13-3(f).

"However, 'the sanction of preclusion is a drastic remedy and should be applied only after other alternatives are fully explored[.]'" State v. Washington, 453 N.J. Super. 164, 190 (App. Div. 2018) (alteration in original) (quoting State v. Scher, 278 N.J. Super. 249, 272 (App. Div. 1994)). "[A]lthough it is the policy of the law that discovery rules be complied with, it is also the rule that

drastic sanctions should be imposed only sparingly." Ibid. (quoting Zaccardi v. Becker, 88 N.J. 245, 253 (1982)). In deciding on a remedy, factors that weigh against preclusion include "(1) the absence of any design to mislead, (2) the absence of the element of surprise if the evidence is admitted and (3) the absence of prejudice which would result from the admission of evidence." Id. at 191 (quoting LaBrutto, 114 N.J. at 205).

All three factors that would weigh against the preclusion of Wehling's testimony are present here. First, there is no hint of a design to mislead in the State's omission of Wehling from its witness list. The prosecution had nothing to gain from the omission, which only put its ability to establish chain of custody at risk.

Second, the record suggests that the element of surprise is absent here. During a colloquy with the judge and defense counsel, the prosecution stated that it produced a version of a "property inventory report" that "did have Ms. Wehling's name on it," but "without signatures[,] back in 2017." Defense counsel said, "I don't dispute that." Based on that disclosure, defendant should have been aware that Wehling played a role in the chain of custody and thus also that she could be called to testify if defendant argued that the State failed to establish chain of custody.

Finally, defendant was not unduly prejudiced by the admission of Wehling's testimony. Her inclusion on the State's witness list would not have changed the defense's strategy of attacking the chain of custody, as Wehling could not account for the evidence's transfer from the Bridgeton police station to the temporary evidence locker. The trial judge expressly considered this when he decided to allow Wehling's testimony while excluding the evidence locker log, explaining "the failure to produce . . . induces this defense. . . . And this argument. And I'm not [going to] deprive the [d]efense of that argument at this point."

Therefore, the trial judge did not abuse his discretion in permitting Wehling to testify or in denying the new trial motion.

## B.

Berry testified at trial that he pled guilty to conspiracy to possess drugs on July 5, 2018, was sentenced to five years of probation on March 14, 2019, and was then facing violations of probation. On cross-examination, Berry stated that his "motivation for testifying" was "[b]ecause the [p]rosecutors came after" him.

Following trial, on August 8, 2019, Berry pled guilty to two violations of probation. On recommendation of the State, Berry was sentenced to remain in

41

Drug Court with credit for time served and an order to comply with all treatment recommendations. Defendant argued that the State failed to disclose a cooperation agreement or some similar, unknown material pertaining to Berry's sentence for the probation violations. In response, the State submitted the certifications of two assistant prosecutors who certified that Berry was not offered an actual or implied plea arrangement in exchange for his testimony against defendant.

The trial judge denied the motion, explaining:

> There is nothing, absolutely nothing remarkable about [the sentence]. It is not, as typified by the defense, a sweetheart [p]lea. It is completely consistent with Drug Court procedure with regard to a first violation in Drug Court to continue him on Drug Court.
>
> So, I do not find that there's any basis to believe, or any prima facie showing that there's some sort of a deal between the prosecution and the witness who testified. That issue, however, was developed under cross-examination during the trial and was presented to the jury. And, so, there's simply nothing there.

Here, defendant argues that the State violated its discovery obligations by failing to "advise defendant of the Berry sentencing." However, defendant does not dispute the trial judge's assessment that Berry's sentence was ordinary. Nothing in the record suggests that he received the sentence as part of a cooperation agreement with the State or was related to defendant's case. The

record simply does not support the existence of undisclosed relevant material pertaining to Berry's violations of probation.

As there was no evidence that Berry's sentence was the product of an agreement for his testimony, the State was not obligated to disclose the sentence itself, which was imposed after the verdict in defendant's case. The State's continuing obligation to disclose discoverable materials does not extend beyond the verdict. State v. Szemple, 247 N.J. 82, 96, 103 (2021). Furthermore, the disposition of Berry's probation violations was available to defense counsel on the docket, where he found it. The trial judge did not err in denying defendant's new trial motion on this basis.

IX.

Defendant argues that all the alleged errors cumulatively deprived him of a fair trial and that the judge erred in denying numerous mistrial motions.

"A defendant is entitled to a fair trial but not a perfect one." Weaver, 219 N.J. at 155 (quoting State v. Wakefield, 190 N.J. 397, 537 (2007)). "In some circumstances, it is difficult to identify a single error that deprives defendant of a fair trial." Id. at 160. However, "[w]here any one of several errors assigned would not in itself be sufficient to warrant a reversal, [but] all of them taken together justify the conclusion that [the] defendant was not accorded a fair trial,

it becomes the duty of this court to reverse." Id. at 155 (quoting State v. Orecchio, 16 N.J. 125, 134 (1954)). "If a defendant alleges multiple trial errors, the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair." Ibid.

But we must assess each of these errors in light of the strength of the State's case when determining whether cumulative error applies. See Sanchez-Medina, 231 N.J. at 469 (concluding that cumulative error "raise[d] serious questions about whether the outcome was just, particularly in light of the strength of the evidence presented," which "was not overwhelming"). Relatedly, we "should not reverse a trial [judge's] denial of a mistrial motion absent a 'clear showing' that 'the defendant suffered actual harm' or that the [judge] otherwise 'abused [his] discretion.'" State v. Yough, 208 N.J. 385, 397 (2011) (quoting LaBrutto, 114 N.J. at 207). However, the strength of the State's case cannot justify affirmance in cases of "structural errors" that cannot be categorized as harmless because they affect the legitimacy of the entire trial. State v. Camacho, 218 N.J. 533, 549 (2014).

Defendant's trial was flawed. Although the error relates to only one point raised on appeal—the admission of Berry's testimony that he had purchased drugs from defendant on a prior occasion—the fact remains that the jury heard

inherently prejudicial testimony on multiple occasions, testimony that the trial judge very likely would have excluded entirely if it had advanced notice of the testimony.

However, neither the sole error below, nor the other objectionable testimony, constitutes structural error. Thus, even assuming error in the admission of that other testimony or flaws in the judge's curative instructions, any cumulative error analysis must consider the strength of the State's case. As previously explained, the evidence of defendant's guilt presented at trial was overwhelming.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION